# United States District Court

## NORTHERN DISTRICT OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. Gainesville

NOV 0 1 2011

_____ HATTEN, Clerk
By _____ (e)
Deputy Clerk

UNITED STATES OF AMERICA

v.

EMORY DAN ROBERTS

**CRIMINAL COMPLAINT**

CASE NUMBER: 2:11-MJ-106

**(UNDER SEAL)**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning on date unknown, and continuing until on or about November 1, 2011, in White and Stephens Counties, Georgia and elsewhere, in the Northern District of Georgia defendant did,

combine, conspire, confederate, agree and have a tacit understanding with Frederick W. Thomas, and others known and unknown, to knowingly receive and possess firearms, specifically, a destructive device and a silencer not registered to them in the National Firearms Registration and Transfer Record in violation of Title 26, United States Code, 5861(d) and 5871

in violation of Title <u>18</u> United States Code, Section(s) <u>371</u>.

I further state that I am a Special Agent of Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof.          (X) Yes          ( ) No

_____
Signature of Complainant
David W. Wylie

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

<u>November 1, 2011</u>          at          <u>Gainesville, Georgia</u>
Date                                                   City and State

SUSAN S. COLE
<u>United States Magistrate Judge</u>          _____
Name and Title of Judicial Officer          Signature of Judicial Officer
AUSA Jeffrey A. Brown

**AFFIDAVIT**

I, David Wylie, being first duly sworn, do hereby depose and State:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately twenty - five years.  I am currently assigned to the FBI's office in Gainesville, Georgia.  My investigative responsibility includes investigating different federal crimes such as bank robbery, bank fraud, mortgage fraud and domestic terrorism.  I have been involved in investigations relating to domestic terrorism and have participated in the execution of search warrants and seized evidence that relates to violations of domestic terrorism statutes.  I know the following principally based on information obtained from my investigation and from other law enforcement officers.

2.  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.  This affidavit is in support of a request for a federal search warrant to be served upon and executed at the residence of Emory Dan Roberts, 1171 Jordan Road, Toccoa, Georgia, 30577 more fully described as a single story family residence frame

1

house located within Stephens County. The exterior is yellow siding with a front covered entrance. The property consists of 1.8 acres which includes the main residence and outbuildings separated from the main residence. The property is recorded on the Stephens County tax map as parcel number 032D 049; to search for evidence, contraband and fruits of a crime as set forth in Exhibit B (attached hereunto and expressly incorporated herein by this reference), as well as any vehicles located on the property and any out buildings located on the properties. I am also requesting authority to search the properties referenced in paragraph 3 and any computers, and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of a conspiracy to possess an unregistered silencer and destructive device in violation of Title 26, United States Code, Sections 5861(d), 5871, all in violation of Title 18, United States Code, Section 371, Conspiracy to murder federal officials in violation of Title 18, United States Code, Section 1117, Theft of Government Property and Title 18, United States Code, Section 641.

4. This affidavit is also being submitted for the purpose of securing a complaint and warrant Emory Dan Roberts (ROBERTS) for conspiring to possess an unregistered silencer and

destructive device in violation of Title 26 United State Code, Sections 5861(d), 5871, all in violation of Title 18, United State Code, Section 371.  I have not included each and every known fact concerning this investigation; rather, I have set forth only the facts believed necessary to establish probable cause for the issuance of the requested search warrant, complaint and arrest warrant.  However, even though I have not included every fact known to date in this investigation, I do not believe anything has been omitted which would vitiate the probable cause set forth herein.

### BACKGROUND OF THE INVESTIGATION

5.  On March 17, 2011, the government's confidential human source (CHS1) consensually recorded a clandestine meeting involving members of a fringe group of a known militia organization, with the fringe group calling itself the "covert group."  The meeting occurred at the residence of Frederick W. Thomas (THOMAS) located at 2265 Dean Mountain Road, Cleveland, Georgia, 30528, and attendees at the meeting included THOMAS, Emory Dan Roberts (ROBERTS), and others.  At the outset of this meeting, the attendees began discussing and then displaying various weapons each one was carrying on his person.  THOMAS mentioned to the group that he had enough weapons to arm everyone at the table.  ROBERTS and CHS1 either did not have

3

weapons, or did not make them visible.

6.    THOMAS became the primary speaker for the meeting and began discussing overt and covert operations for the group. He mentioned a fictional novel he had read on-line in which an anti-government group killed a large number of federal Department of Justice attorneys, and then he stated, "Now of course, that's just fiction, but that's a damn good idea."    THOMAS described a scenario in which he felt would be the "line in the sand" that would result in the activation of militias. THOMAS believed that soon, during a protest action, a protestor would be shot. It is his opinion the militias would act and respond by openly attacking the police. He then openly discussed having compiled what he called the "Bucket List" which is a list of government employees, politicians, corporate leaders and members of the media he feels needed to be "taken out" to "make the country right again."    THOMAS told the group he sent the list to a web blog.

7.    During the meeting, THOMAS made the following statements:

> a.    "The right people have to be taken down, and taken down soon."
>
> b.    "There is no way for us, as militiamen, to save this country, to save Georgia, without doing something

4

that's highly highly illegal.  Murder.  That's fucking
illegal, but it's gotta be done."

c.    "When it comes time to saving the Constitution,
that means some people gotta die."

8.    When murder was mentioned, ROBERTS said he knew people
in Habersham County [Georgia] who had a substance that could kill
people with a very small amount.  CHS1 suggested ROBERTS was
talking about ricin, and someone else agreed, adding that ricin
is made from castor beans. The conversation then went into a
discussion about castor beans and possible ways to obtain them.

9.    THOMAS spoke of the need for the group to acquire more
weapons, ammo, food, and survival gear and then discussed the
need for the group to establish a silent means of taking people
out.  THOMAS suggested silencers for handguns, stating, "In order
to do what we want to do, take out the right people, we have to
have some silent means of doing it.  That means suppressors on
handguns."

10.    THOMAS stated they needed to find a machinist with the
ability to manufacture silencers and not register them with the
ATF.  THOMAS said this was necessary to prevent them from being
traced back to an owner if they were lost. THOMAS also mentioned
a gun store near the Georgia/South Carolina border that
manufactures silencers and he commented that they should consider

5

"hitting the truck," meaning they should steal the silencers from the trucks.

11. On April 3, 2011, CHS1 consensually recorded a meeting with THOMAS and ROBERTS at a restaurant in northeast Georgia. The attendees talked about acquiring ammunition and equipment, particularly silencers for firearms. THOMAS suggested that they buy, steal, make, or attack a manufacturer's truck in order to obtain the silencers. THOMAS also talked again about his "Bucket List" of people he thought should be killed. During the meeting, THOMAS stated that he thought they could "fight off a SWAT team." He also stated, "I've been to war, and I've taken life before, and I can do it again."

12. On April 16, 2011, CHS1 consensually recorded another meeting of the "covert group," again at the residence of THOMAS located at 2265 Dean Mountain Road, Cleveland, Georgia, 30528. Attendees included CHS1, THOMAS, ROBERTS and others. During the meeting THOMAS discussed the need for the group to start moving forward with taking action in some of their previously discussed plans, including a number of assassinations on various government officials.

13. THOMAS also explained to the others present that he intended to model their actions on the plot of an online novel called Absolved. The plot of Absolved involves small groups of

6

citizens attacking United States federal law enforcement representatives and federal judges. THOMAS expressed his belief that they should conduct a number of assassinations on various government officials, and he particularly expressed a desire to kill Department of Justice (DOJ) and Internal Revenue Service (IRS) employees.

14. During the meeting, THOMAS made the following statements:

    a. "Civilian government operatives is who we're going to be shooting at: IRS, ATF, FBI, and the cops."

    b. "Who is the primary topics, targets? DOJ. Everybody in DOJ. That includes judges, ATF, IRS, and the hierarchy thereof."

    c. "I could shoot ATF and IRS all day long. All the judges and the DOJ and the attorneys and prosecutors."

15. On April 29, 2011 and April 30, 2011, CHS1 consensually recorded conversations between, CHS1, THOMAS and ROBERTS while traveling to and from a meeting held in south Georgia on 04/30/2011. During a conversation on April 30, 2011, THOMAS mentioned that, while at the meeting, he spoke to a second confidential source (CHS2) about acquiring silencers. THOMAS reiterated the need for the group to obtain silencers to shoot people quietly. THOMAS suggested they obtain unregistered, .22

caliber long rifles, cut them down and thread them to accommodate a silencer.   During the ride, THOMAS asked ROBERTS whether he (ROBERTS) thought they should try to grow their group larger, "or stick to what we are planning on, assassinating 4 or 5 guys and that's it?"  ROBERTS replied, "I think probably we need both."

16.   On May 17, 2011, CHS1 met with THOMAS and ROBERTS to further discuss the group's plans.   (This meeting was not recorded.)   CHS1 reported that THOMAS indicated the group was ready to move forward with acquiring silencers from an active duty soldier in the U.S. Army.   At some point in the conversation, explosives were mentioned and THOMAS became very excited and said the group really needed to get some explosives. THOMAS mentioned that he is very disgruntled with the IRS and the Bureau of Alcohol Tobacco and Firearms (ATF).   THOMAS indicated that he was considering driving to the Atlanta area to survey/locate IRS and ATF buildings.

17.   ROBERTS mentioned he had recently been talking to a former U.S. Army soldier in Stephens County [Georgia], described as a "loose cannon," who has manufactured ricin. ROBERTS said that he had personally seen the ricin in powder form.

18.   On May 21, 2011, CHS1 reported that THOMAS was scheduling a trip to Atlanta to conduct surveillance on the IRS and ATF buildings on May 24, 2011.   THOMAS invited ROBERTS and

8

CHS1 to ride with him during the surveillance.

19.   On May 24, 2011, THOMAS and CHS1 drove to Atlanta in THOMAS's 2006 Red GMC Canyon Pickup Truck, license plate Georgia BMB 0821.   CHS1 consensually recorded the trip.   THOMAS and CHS1 planned and conducted surveillance on the ATF (2600 Century Parkway, Atlanta, Georgia 30345) and the IRS (401 West Peachtree Street NW, Atlanta, Georgia 30308) buildings to plan and assess for possible attacks.

While driving, THOMAS discussed with CHS1 the types of weapons they wanted to acquire illegally.   While driving home after conducting the reconnaissance, THOMAS and CHS1 discussed how to conduct further surveillance inside and how to attack the buildings with explosives.

20.   During the trip to Atlanta, THOMAS made the following statements:

a.   "Let's shoot the bastards that we discover are anti-American

or enemies of America, treasonous.   And to me the easiest and best way to do that is to walk up behind them with a suppressed .22.   I am of the, uh, old school, Mafia; one behind the ear with a .22 is all you need."

b.   "Of course a .40 Smith and Wesson or .45 ACP is just as good, even better, cause it makes the whole head explode."

c. "Now of course this trip is reconnoitering. There's two schools of thought on this: go for the feds or go for the locals. And I'm inclined to consider both."

d. "We'd have to blow the whole building, like Timothy McVeigh."

e. "If we were gonna blow the buildings, it would be smart to hit 'em both at the same time."

f. "Plant the explosive right up against the wall, a shaped charge. We can do it. Okay, let's do it then."

g. "We can also do our own homework on making from scratch, mortars, what the hell's that, claymores, and grenades."

h. "We've gotta have a lot of explosives."

21. On April 30, 2011, CHS2 consensually recorded a meeting with THOMAS at a rest stop near Macon, Georgia. THOMAS expressed an interest in acquiring weapons, silencers, and explosives from CHS2, and he provided CHS2 with a handwritten list of 28 items he would like to acquire for the covert group. The list consists of firearms, silencers, and explosives. THOMAS was under the impression that CHS2 could obtain the items for the group. THOMAS informed CHS2 that the covert group was looking for ways to conduct assassinations.

22. On June 9, 2011, an undercover employee (UCE) consensually recorded a meeting with THOMAS and ROBERTS at a

10

restaurant in Lavonia, Georgia.   (The UCE had been introduced to THOMAS by CHS2 as an acquaintance who deals in black market weapons.)   During the meeting, THOMAS told the UCE that the group would like to purchase silencers and explosives from the UCE. The UCE advised that he could probably obtain the requested materials for them.   THOMAS explained to the UCE that the "covert group" was planning to carry out the actions of the main characters from the book Absolved.   THOMAS told the UCE that he considered himself to be expendable at his age, and was prepared to die if necessary.   Both THOMAS and ROBERTS told the UCE that they have specific targets in mind.   THOMAS added that they had already conducted surveillance in support of their plan.   THOMAS discussed the manufacture of shape charges and electronic detonators, saying, "I can make a detonator, electronically." At one point during the meeting, THOMAS also stated "We know what we wanna do. We know how to do it. But we need (unintelligible) prepared to do it, so that's what we're doing now... Making the preparations, getting what we need so that when we go about doing it, we are equipped. Don't know when that's gonna be; within a year I'm sure."   Later in the meeting the UCE asks about their proposed time frame for acquiring explosives and silencers being about a year, and ROBERTS responds, "a little less."

    23.   THOMAS also made the following statements during the

11

described meeting:

    a.   "Yea, uh, claymore mines, we can make these things, but I'd

rather have store bought, a real one."

    b.   "I could go to the guy's house, I could find his house,

okay, and shoot him in his back yard, as far as that goes."

    c.   "We need to place within an ATF or DEA big black van.

When they fill up their people, we're gonna take 'em all out at

once."

    d.   "I ain't worried about dying."

    24.   On June 24, 2011, CHS1 consensually recorded a meeting

with THOMAS and ROBERTS in northeast Georgia to discuss bringing

another individual into the covert group.   During the meeting,

THOMAS talks about having "reconnoitered" government buildings in

Atlanta.   THOMAS then says, "And uh, they're surrounded by office

buildings.   Now that doesn't mean we can't get at the building.

We can blow the buildings up.   It's doable.   But uh, it also

means that if you're stationed somewhere in another building

nearby, or on, not on a roof, but inside, you can take out

selected people with a sniper rifle and suppressor."

    25.   On June 28, 2011, CHS2 made a consensually recorded

phone call to THOMAS.   THOMAS expressed interest in obtaining

weapons and equipment for the "covert group" from the UCE.

THOMAS stated that he and the other members of the group have begun physical training and fitness to prepare for the physical demands that their plans may require.

26.   On July 13, 2011, UCE placed a consensually recorded call to THOMAS.   THOMAS informed the UCE that the "covert group" was still interested in obtaining handgun and rifle silencers stating, "We still need a couple of the, um, noise cancellers, and we're gonna decide how we're gonna pay for that so we'll be back to you on that."   THOMAS and the UCE discussed possible options to barter for the items that THOMAS would like to acquire from the UCE.   Options discussed were THOMAS trading homemade bomb detonators and unregistered handguns that he owns.

27.   On July 16, 2011, THOMAS replied via email to a July 15, 2011 email that had been sent to THOMAS by the UCE.   The originating email from the UCE included two attached videos, the first video was forty (40) seconds and the second was fifty-five (55) seconds.   The attached videos displayed a controlled explosion that was conducted under the supervision of an FBI Special Agent Bomb Technician (SABT), and showed the detonation of an FBI SABT-built improvised explosive device.   The UCE told THOMAS that the video was of the type of product the UCE could get for THOMAS.   THOMAS sent the following response from his email account (a6h2a7b@windstream.net):

"Wonderful. Imagine! I used to do that for a living, and never thought to put any aside.   Helluva'n effect for so small a package!   Interested?   You bet!!!   I'll show this to Cobra (ROBERTS), and then we'll work out what we might be able to swap for some.   Thanks!"

28.  During the course of the instant investigation CHS1 communcated with ROBERTS via e-mail.   On June 22, 2011, agents received records showing there was a Windstream communications account at ROBERTS' residence in the name of Margaret Roberts. Also during the consensually recorded meeting on April 16, 2011, ROBERTS stated that he had DSL with Windstream (DSL stands for Digital subscriber line and allows for user to access the internet using standard home telephone line).

29.   During the course of the investigation of ROBERTS, THOMAS and others affiliated with the "covert group," they have communicated with each other utilizing email, text messaging and cellular telephones for purposes of furthering their agenda as outlined in this affidavit.   Several of the emails exchanged between THOMAS (ahab627@windstream.net, a6h2a7b@windstream.net), ROBERTS (libby1956@windstream.net) and CHS1 discuss meeting places and times, training agendas, equipment needs and other issues pertinent to achieving the goals of both their overt and covert mission.   Further, during the course of the investigation,

14

THOMAS has emailed CHS1 hundreds of open source articles he obtained from the internet. Some the recent e-mails from ROBERTS and THOMAS include an e-mail from libby1956@windstream.net on October 25, 2011, in response to CHS1's e-mail about whether ROBERTS had everything he needed for the upcoming meeting that was held on October 29, 2011. On October 18, 2011, CHS1 received an e-mail from THOMAS using email address a6h2a7b@windstream.net concerning THOMAS's request for assistance with establishing a new militia group.

30. On July 18, 2011, CHS2 placed a consensually recorded call to THOMAS. CHS2 asked THOMAS who was in charge of the "covert group" and THOMAS affirmed that he was in charge. Later in the call THOMAS stated, "Am I the guy that's leading? Yes, I am." THOMAS also told CHS2 that the "covert group" intended to meet with the UCE about acquiring "supplies" and to discuss potential prices, referring to their desire to obtain military grade equipment and weapons.

31. On July 18, 2011, UCE placed a consensually recorded call to THOMAS. THOMAS mentioned the emailed videos of a detonated explosive that the UCE had sent to THOMAS, saying that he had showed it to Cobra (ROBERTS) and that ROBERTS had said, "Wow!" The UCE then asked "Is that what you guys are looking for?" and THOMAS replied, "Yep, exactly." THOMAS discussed

15

trading or bartering some of his unregistered weapons for items from the UCE. THOMAS also indicated that ROBERTS might have some property to swap for items from the UCE, indicating that he (THOMAS) would let the UCE know about the possible trades "As soon as I can get word from Cobra (ROBERTS) about what he wants to swap. I had him put together a list of what he's got so I can give that to you, and then you can pick and choose." THOMAS reaffirmed his desire to acquire silencers for 7.62 millimeter rifles. THOMAS told the UCE that the "covert group" still had an interest in smaller caliber silencers, but that they were prioritizing the 7.62 rifle.

32. On August 1, 2011, CHS1 consensually recorded a meeting with THOMAS, ROBERTS and another individual in northeast Georgia. They talked about acquiring TNT and building their own explosive devices. They discussed various types of detonators, but seemed to focus primarily on using pre-paid cell phones.

33. On August 13, 2011 CHS1 consensually recorded a meeting with ROBERTS at a restaurant in Cornelia, Georgia. THOMAS was supposed to attend, but just prior to the meeting, THOMAS called to advise he would not be able to make it. THOMAS stated that ROBERTS was fully briefed and could brief CHS1. At the meeting ROBERTS provided CHS1 with an ICOM two way radio for team communications. ROBERTS alleged that the radios had been stolen

16

from the United States Army in Afghanistan.

34.   A visual inspection of the radio provided to CHS1 by ROBERTS revealed the exterior serial numbers and identifiers have been deliberately obliterated.   Upon powering up the radio the text identifiers assigned to the channels indicate military unit nomenclature.   At this time efforts are underway to determine the status of the radio via the assigned electronic serial number.

35.   On August 20, 2011, CHS1 consensually recorded a meeting with THOMAS and ROBERTS at THOMAS's residence.   During the meeting, THOMAS made the following statement:   "We need high explosives, not just run of the mill explosives.   Because we have to make, fabricate, any number of weapons types: claymores, grenades, shaped charges, RPG rockets, or bazooka rockets that are shaped charges."

36.   On September 11, 2011, UCE placed a consensually recorded call to THOMAS.   THOMAS talked about wanting a silencer for a rifle.   The UCE asked, "Is that something you plan on using?"   THOMAS replied, "Oh yea, oh yea.   Definitely."

37.   On September 20, 2011, CHS1 consensually recorded a meeting with THOMAS and the UCE at a restaurant in Lavonia, Georgia.   Prior to the arrival of the UCE, THOMAS talked to CHS1 about wanting a silencer, and he stated, "I'd love it for the M1A. If you're gonna use it as a sniper rifle and actually kill

somebody, which I intend to do, your best bet is to clean the weapon, ultra clean, load it with 5 rounds, put the suppressor on, wipe it down clean, then put the rubber gloves on so when you pick it up you ain't leavin' prints."

38. During the meeting with the UCE, THOMAS agreed to buy a silencer and conversion parts (to make a rifle fully automatic) from the UCE for himself in exchange for a gun that he will trade to the UCE. THOMAS also agreed to purchase an explosive device from the UCE for $1,000 with the cost being split between THOMAS, ROBERTS and CHS1. THOMAS and the UCE agreed to conduct the transaction in about 30 days from their meeting.

39. Also during the meeting, the UCE asked THOMAS, "So you're more interested in the other thing (referring to silencer) first?" THOMAS replied, "Yea, we have, uh, a mission in mind, and I want to get it carried out." The UCE also said to THOMAS, "I mean, you obviously have a target because I've talked to you about it." THOMAS replied, "I do."

40. On September 25, 2011, UCE placed a consensually recorded call to THOMAS. The conversation included the following:
UCE:    "Now my question is, um, as far as, I mean, potency, like what do you, I mean do you want to take off a pillar at a building, a car, what?"
THOMAS:  "A car."

18

UCE:  "Okay, you want to be able to take a car off."

THOMAS:  "Yea."

UCE:  "So something like you saw in that video is gonna be good."

THOMAS:  "Oh yea. Perfect."

41.  On October 15, 2011, CHS1 consensually recorded a meeting with THOMAS, ROBERTS and others at 558 Lakeside Drive, Toccoa, Georgia.  CHS1 met with THOMAS and ROBERTS to discuss the purchase of the explosive device from the UCE.  The following conversation occurred:

CHS1:  "You sent me an email, we pushed this back to November 1st, so we're good.  Okay.  All right, I got, I got my money.  You got yours Dan?

(unintelligible)

ROBERTS:  "I'll be okay."

CHS1:  "Do you want me to bring it to you?" (directed to THOMAS)

THOMAS:  "Yea."

42.  On October 18, 2011 CHS1 corresponded via email with THOMAS.  In the email exchange it was decided that THOMAS, ROBERTS and CHS1 will meet later in the week to pool their money together to buy an explosive device from UCE.

43.  On October 21, 2011, CHS1 met with THOMAS and ROBERTS at a

19

restaurant in Lavonia, Georgia. Before the arrival of THOMAS, ROBERTS expressed some concern about buying the explosive device from the UCE because ROBERTS is concerned the UCE could be a "cop", but ROBERTS advised he is still going through with the deal and that he would be with THOMAS at the transaction. After THOMAS arrived and after they ate, CHS1 gave THOMAS his share of the cost for the device being purchased. ROBERTS advised that he would get his share to THOMAS this week. ROBERTS also stated that the next group meeting on October 29, 2011 will be at his residence, which is located at 1171 Jordan Road, Toccoa, Georgia, 30577.

44. When ROBERTS has driven to the various meetings described in this affidavit, he has usually driven to his 1990 Red Ford Ranger Pickup Truck, license plate Georgia BWX7838 which is registered to ROBERTS at his residence located at 1171 Jordan Road, Toccoa, Georgia.            **Reliability of the Sources of Information**

45. During the course of the investigation of ROBERTS, THOMAS and others affiliated with the Covert Group, the FBI as utilized to confidential human sources. The credibility of CHS1 and CHS2 has been demonstrated by the sources' accurate recounting of the conversations recorded during meetings with ROBERTS, THOMAS, when compared to the audio and video recordings of the meetings and physical surveillance of those meetings conducted by law

enforcement agents. Law enforcement agents assisting with the instant investigation have listened to and/or viewed consensually recorded telephone calls and video recordings.

46. CHS1 is currently on bond for pending felony state charges. The FBI administered a polygraph test to CHS1 during the investigation of a militia group. The FBI polygrapher determined that CHS1 gave less than truthful responses concerning the activities of the militia group.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

47. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

48. I submit that if a computer or storage medium is found at the residences listed in paragraph 3, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience and consultation with FBI forensic computer experts, I know

21

that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the

22

form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

49.   Forensic evidence.   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave

23

traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or

24

storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-

virus programs (and associated data) may be relevant to establishing the user's intent.

50. Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it

26

will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

51.    Nature of examination. Based on the foregoing, and

27

consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

52. Based on the aforementioned factual information, your affiant respectfully submits that that there is probable cause to believe that there is now concealed evidence, as described in detail in Attachment B, of evidence of the commission of criminal offenses, namely, violation of Title 26, United States Code, Sections 5861(d), 5871, all in violation of Title 18, United States Code, Section 371, Conspiracy to murder federal officials in violation of Title 18, United States Code, Section 1117 and Theft of Government Property and Title 18, United States Code, Section 641 is located in the residences more fully described in paragraph 3, and this evidence, listed in Attachment B to this affidavit, which is incorporated herein by reference, is contraband, the

28

fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

53. Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that THOMAS and ROBERTS conspired to possess an unregistered silencer and destructive device in violation of Title 26, United State Code, Sections 5861(d), 5871, all in violation of Title 18, United State Code, Section 371.

54. Finally, because of the ongoing nature of the investigation, and to ensure the safety of the confidential source and law enforcement officers involved, I request that the search warrants, applications, complaints, arrest warrants and affidavits in support thereof, be SEALED until further order of this Court.